NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 190583-U

NO. 4-19-0583

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
January 14, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* I.D., J.N., and C.N., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County |
| Petitioner-Appellee, | ) | No. 17JA24 |
| v. | ) | |
| Bertha D., | ) | Honorable |
| Respondent-Appellant). | ) | Brett N. Olmstead, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Turner and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, finding the trial court's decision to find respondent unfit and terminate her parental rights was not against the manifest weight of the evidence.

¶ 2    In April 2017, the State filed a petition for adjudication of neglect with respect to I.D., J.N., and C.N., minor children of respondent, Bertha D. In June 2017, the trial court adjudicated the minors neglected, made them wards of the court, and placed custody and guardianship with the Department of Children and Family Services (DCFS). The State filed a motion to terminate respondent's parental rights in August 2018. Following several non-consecutive hearings on the State's motion for adjudication and termination of respondent's parental rights, the trial court found respondent unfit. A best-interest hearing was held in August 2019, where the trial court found it was in the best interest of the minors to terminate respondent's parental rights.

¶ 3        On appeal, respondent argues the trial court erred in finding her unfit and terminating her parental rights as the decision was against the manifest weight of the evidence. We disagree and affirm.

¶ 4                                    I. BACKGROUND

¶ 5        Respondent is the mother of four children, three of whom are pertinent to this appeal. At the outset of the case, J.N. was almost three years old, C.N. was one year old, and I.D. was almost two months old.

¶ 6        On April 26, 2017, a petition for adjudication of neglect with respect to J.N., C.N., and I.D. was filed, alleging the minors were neglected due to an injurious environment when residing with respondent and/or Curtiz N. due to exposure to domestic violence. An emergency shelter-care hearing was conducted the same day.

¶ 7        Respondent stipulated and agreed to temporary custody being placed with DCFS at the shelter-care hearing. The trial court's order also noted a lengthy history of domestic violence in the relationship between respondent and Curtiz N., including domestic violence in the children's presence. Intact services were offered and refused. The court set the case for an adjudicatory hearing.

¶ 8                              A. Adjudicatory Hearings

¶ 9        In June 2017, the court held an adjudicatory hearing where respondent stipulated and admitted to count I of the petition, which alleged all three children were neglected within the meaning of the Juvenile Court Act of 1987 "by reason of being minors under 18 years of age whose environment is injurious to their welfare when they reside with [respondent] *** in that said environment exposes the minors to domestic violence." 705 ILCS 405/2-3(1)(b) (West 2016). The trial court found the stipulation was supported by a factual basis and accepted it. The

exhibits offered by the State, to which respondent stipulated, were admitted into evidence. They consisted of police reports detailing several domestic violence incidents involving respondent and Curtiz N. in April 2017. The court found respondent and Curtiz N. had a recent pattern of domestic violence as well, some of which occurred in the presence of their children, and was previously described by J.N. The court concluded the repeated incidents of domestic violence created an injurious environment in the home.

¶ 10　　　The dispositional hearing was held in July 2017. Based on the reports and evidence presented, the trial court entered a written order finding respondent suffered extreme trauma throughout her life and has been unable to sufficiently address its effect upon her to maintain a safe home for her children, free of domestic violence and other environmental dangers. The court found respondent unfit and found it was in the best interest of the children for them to be made wards of the court, with custody and guardianship being placed with DCFS. The court admonished respondent to cooperate with DCFS and comply with her service plan, outlining the various things she either needed to do or refrain from doing to regain custody of her children.

¶ 11　　　At the permanency review hearing in October 2017, respondent remained unfit and was specifically ordered to allow DCFS and the court-appointed special advocate (CASA) to inspect her home. Further, she was ordered to attend all service appointments, drug screens, and visits. The permanency order of January 2018 indicated respondent made reasonable progress and efforts, and she was to attend and complete all services. The April 2018 permanency order found respondent to have made reasonable efforts, and she was to attend all service appointments, reengage in domestic violence counseling, participate in all drug screens, and obtain a psychiatric assessment. By the July 2018 permanency review hearing, respondent was

found not to have made reasonable progress and efforts and was ordered to provide DCFS with all necessary information it requests, attend all appointments for services, and participate in all drug screens. In each instance, she was supposed to be able to demonstrate she was learning from the services provided and applying what she learned during her visits.

¶ 12 In August 2018, the State filed a motion seeking a finding of unfitness and termination of respondent's parental rights. Count I, the only count applicable to respondent, alleged she, along with respondent father and any unknown fathers, was an unfit person within the meaning of section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2016)) because she failed to make reasonable progress toward the return of the minors to her care during any nine-month period following the adjudication of neglect or abuse, specifically the period from November 20, 2017, to August 20, 2018.

¶ 13 B. Termination of Respondent's Parental Rights

¶ 14 Beginning on January 2, 2019, continuing on April 8, 2019, and concluding on June 18, 2019, the trial court heard evidence on the motion to terminate parental rights.

¶ 15 1. *Officer David Butler*

¶ 16 Officer David Butler testified on March 21, 2018, he was called regarding a domestic dispute on North Neil Street in Champaign, Illinois. When he arrived, he spoke with respondent who said she was arguing with her current boyfriend of five months and "they had got in each other's face." She reported the domestic incident escalated and he punched her twice in the face, on at least one occasion causing her face to hit a wall, and punched her in the arm and ribs. Officer Butler said both sides of her face were red and swollen and her left upper arm was bruised.

¶ 17 2. *Lauren Bennett*

¶ 18 Lauren Bennett, a child welfare specialist for DCFS, testified she was the caseworker for this case in September 2018. Since her involvement in the case postdated the period alleged in count I, her testimony was limited to the putative father (Curtiz N.).

¶ 19                                 3. *Lauren Smith*

¶ 20 Lauren Smith testified she worked for Lutheran Social Services of Illinois (LSSI) as a child welfare specialist and was the caseworker for respondent's three children from April 2018 to September 2018, when she handed the case off to Bennett. Smith testified she would have met respondent soon after taking over the case. At that time, respondent was working at a store in the mall in Champaign and had an apartment she shared with her sister, which was located fairly close to the mall. Neither the apartment nor respondent's sister as a roommate posed any concerns to Smith at that time. Although according to her service plan, respondent was supposed to be engaged in domestic violence counseling, she was not doing so at the time Smith took over the case, so she referred respondent for both domestic violence and individual counseling at Cognition Works in May or June 2018 and respondent began attending sessions.

¶ 21 Respondent had supervised visitation with the children for approximately two hours a week. When Smith took over the case, the visitations were being conducted at her apartment with a case aide present. However, sometime in May or June 2018, respondent advised Smith she was moving to another apartment with a friend whose name she refused to provide to DCFS for a background check. Smith was also not permitted access to the apartment in order to conduct a home safety check, which would be necessary before visitations could take place there. Although she was advised of the effect her refusal to cooperate would have on visitations, respondent continued to refuse, so visits had to be moved from her apartment. This continued for several months before respondent agreed to give DCFS access to the apartment for

a home safety check. By that time, respondent advised she was about to move elsewhere, so Smith waited for the next move before conducting the check on the new apartment. As a result of the first move, the visits occurred in public places or at the LSSI office. Without the ability to conduct an investigation of the roommate or the apartment, DCFS was not able to authorize visits at respondent's home. Respondent was also offered third-party supervised visits; however, respondent never provided Smith with a name of someone who could be a third-party supervisor, so they never took place.

¶ 22       According to Smith, during the time visits were still at her apartment, respondent did not indicate she had a paramour or boyfriend but that she was "talking to" someone. On one occasion, when Smith arrived at respondent's apartment with the children for a supervised visitation, respondent arrived with an unknown male. Smith asked if he was her boyfriend, and she said, "they were just talking." Respondent would not provide Smith with his name and did not ask that he be allowed to stay during the supervised visit with the children. However, she did inquire about the possibility of the unidentified man serving as the third-party supervisor for later visits, but she continued to refuse to provide his name. When told DCFS would need to perform a background check on him, respondent provided no further information.

¶ 23       Smith said she was aware of a domestic violence incident in March 2018 and was aware respondent indicated in the police report she had been seeing someone named "Jonathan" for five months. This information had not been provided to Smith or DCFS, although respondent was required to do so. In fact, Smith testified when she took the case over, respondent denied she was involved with the man from the domestic incident.

¶ 24        Smith testified she observed visits between respondent and her children by stepping in to observe at least once a month. In addition, she believed she was also present for an

entire visit in April or May 2018. From what she observed, Smith said, other than momentarily, respondent was unable to manage all three children. Smith said there would be instances of "a lot of screaming, throwing toys *** it just was a lot of difficulty following through with discipline." For the majority of the supervised visits, respondent would have difficulty maintaining control and discipline with all three children.

¶ 25        Although respondent was told she needed to bring diapers and other needed supplies to the supervised visits, she never did.

¶ 26                                4. *Rachel Kramer*

¶ 27        Rachel Kramer testified she also works at LSSI as the program director and was the caseworker for respondent's children from the end of April 2017, when the case opened, to August 2017 and directly managed the case from March 2018 to the beginning of April 2018. She was the author of some of the permanency reports utilized during the pendency of the case. Kramer testified that respondent was required to complete domestic violence counseling, individual counseling, parenting classes, a substance abuse assessment, and drug screens. She was recommended for both a psychiatric as well as a psychological assessment. Kramer explained respondent denied needing or wanting any psychiatric medication, so the decision was made to wait on a psychiatric evaluation until the psychological assessment was completed, which occurred in December 2017. Respondent was referred to Cognition Works, a contract agency for both domestic violence and individual counseling. Kramer further testified respondent completed her parenting classes through LSSI and a substance abuse assessment, which did not recommend further treatment. In addition, respondent was directed to perform random drug screens.

¶ 28                                5. *Debbie Nelson*

¶ 29        Debbie Nelson is the director of services for Cognition Works, a community-based counseling service provider. Her first contact with respondent was in October 2017, when she was referred for services with their options group, which at that time was an 18-week domestic violence program for women. Nelson testified she has been involved in managing programs of this type for approximately 20 years. The options program was designed to provide counseling to clients once a week for an hour and a half. Respondent did not complete services after her first referral in October 2017, and she was referred again in December 2017 for the 18-week program. She participated in services for about two to three months before she stopped attending and was eventually terminated from the program. She was referred for the third time in April 2018, by which time the program had been expanded an additional six weeks, with the addition of a program addressing the effects of exposure to domestic violence on children.

¶ 30        At the time of the continued hearing in April 2019, respondent was still enrolled in the program and had six sessions left to complete. Nelson explained respondent's length of time in domestic violence counseling was due to her multiple absences, most of which had been excused. Nelson said respondent indicated she had problems with transportation and money for public transportation in order to consistently attend classes.

¶ 31        Nelson testified respondent had recently "kind of made a turning point," which she estimated to have been sometime in January, where her attendance became "very regular" and she appeared to become more serious about the program.

¶ 32                    *6. Valerie Cintron*

¶ 33        Valerie Cintron testified she is employed by Cognition Works and was so employed during the relevant times alleged in the motion for termination between November 2017 and August 2018. Respondent was her client during this time frame after being referred by

- 8 -

LSSI. She met with respondent for her initial intake in June 2018 and then for five sessions thereafter. Respondent had been referred for counseling services to address her "trauma history," to discuss ways to regulate her emotions, and to address her parenting skills. Cintron met with respondent from June until September 2018. Respondent was terminated from services on October 5, 2018, because her failure to attend regularly affected her ability to make significant progress with individual counseling. Although respondent refused to talk about the trauma in her life throughout her attendance, Cintron was able to discuss with respondent parenting and regulating respondent's emotions. However, it was not possible for Cintron to determine whether respondent was actually able to implement what she was taught due to her inconsistent attendance. Cintron said respondent reported her inability to attend some sessions was due to transportation issues and her illness during pregnancy. Although homework was a necessary component of respondent's involvement with counseling, Cintron said she never received any completed homework or projects from respondent. Cintron also told respondent to contact her caseworker if there were transportation issues.

¶ 34                                    7. *Respondent*

¶ 35        Respondent testified she was required to complete domestic violence counseling at Cognition Works and she signed up the first time in October 2017. She was unsuccessfully discharged from Cognition Works for missing too many classes because of transportation issues. She reengaged with Cognition Works in December 2017 and was unsuccessfully discharged in March 2018 due to lack of attendance because she continued to have transportation issues. She was reenrolled in Cognition Works for a third time in May 2018 and missed a couple of classes during this session, but they were excused absences because she became ill during her fourth pregnancy. Respondent said during these sessions she was learning more, taking it more

- 9 -

seriously, and was using the teachings from her classes and applying them to her everyday life. She admitted dating someone from November 2017 to August 2018, but she did not call him a boyfriend, although he is the father of her youngest child. During that same period of time, respondent testified she was employed at Macy's and Bath & Body Works, and she was currently employed at Walmart. Although she provided her employer with scheduled counseling appointments or visits, respondent claimed she was still scheduled to work on those days. Respondent testified that during the same November 2017 to August 2018 time frame, she enrolled herself in a program called Healthy Beginnings where she was assigned a nurse who assisted her throughout her pregnancy. Respondent said she also received assistance through her church.

¶ 36 At the conclusion of the hearing, the State argued it had proved by clear and convincing evidence respondent failed to make reasonable progress during the nine-month period from November 2017 to August 2018. It pointed out the case had been ongoing since April 2017 and was now well beyond two years old. The nine-month period alleged in the motion was not the initial nine months, but, in fact, well into the progress of the case. The State noted the case was initiated because of domestic violence issues, and yet Officer Butler's testimony concerning a domestic incident involving injuries to respondent occurred in March of 2018, well after the case's opening. The State also pointed to the testimony of Debbie Nelson, indicating respondent's involvement in her counseling services had not begun to improve until January 2019, well after the relevant nine-month period. Before then, Nelson testified respondent was not always respectful in her group counseling sessions and it did not appear she was learning anything. The State also pointed out that respondent's visitations with her children have remained supervised throughout the pendency of the case, noting she could have received third-

party supervision had she ever identified anyone suitable for that purpose.

¶ 37    The guardian *ad litem* (GAL) argued the court should find the State had met its burden as to respondent. Noting the case began with issues of domestic violence, the GAL pointed out respondent was referred to domestic violence services three times. Although she was currently showing progress, during the relevant time period before August 2018, she failed to engage in any meaningful participation or complete services. The GAL noted the inconsistent participation in therapy and the fact respondent was involved in a domestic violence incident as late as March 2018. The GAL also referenced respondent's claim that much of her lack of involvement in services and referrals was due to her illness during pregnancy. She reiterated an observation by the State that according to respondent's testimony and the date of birth of her child, her pregnancy-related illness would not have started until August 2018, at the very end of the relevant nine-month period. The GAL recommended a finding against respondent.

¶ 38    Respondent argued although she remained involved in services at the end of the relevant nine-month period, she had made progress and engaged in the services needed during that same period. Although she had been discharged from Cognition Works twice, she continued to reengage. Respondent contended that, but for her transportation issues, she would have completed the recommended services. She also argued she had benefitted from the services during this last period of involvement, and she was learning how to address and deal with many of the issues surrounding domestic violence with which she had been involved at the outset of the case. Acknowledging the domestic violence incident in March 2018, respondent argued she handled it appropriately by contacting the police and discontinuing the relationship. Respondent also noted she had attended her visits and had a stable job and housing during this time period as well. Encountering transportation issues, respondent had problems with attendance, which the

agency was unable to help her alleviate. She also suffered health issues relating to her most recent pregnancy, which contributed to her lack of attendance. Furthermore, she stated her cooperation and willingness to engage had been consistent and had improved. She claimed she was now motivated to make it to her classes and meaningfully engage in services.

¶ 39        After hearing arguments and considering all the evidence, the trial court noted it had the opportunity to view the witnesses and assess credibility based on those in-person observations. The court observed failure to make reasonable progress is an objective standard, and the court is not to consider the subjective circumstances of the parent. "The standard asks, by the end of that nine-month period, had the parent made such progress during the period that it could be said that the child or children could be returned to that parent in the near future once you look at that end date."

¶ 40        After finding the State proved by clear and convincing evidence the counts relating to the respondent fathers due to their lack of involvement with the children and failure to engage in services, the trial court focused on the sole count against respondent, which also required the State to prove, by clear and convincing evidence, she failed to make reasonable progress toward the return of her children during the relevant nine-month period between November 20, 2017, and August 20, 2018. The court distinguished evidence from outside the nine months it considered relevant from that which was not. The court stated, "[Respondent] had a really hard time engaging with [DCFS] immediately." The dispositional order specifically noted that "[respondent] has suffered extreme trauma throughout her life and has been unable to address its effect upon her sufficiently to maintain a safe home for her children free of domestic violence and other environmental dangers." The relevance of the period of time between disposition and the beginning of the nine-month period in November was, in the opinion of the

trial court, to show the then-current status of respondent's involvement and progress when the time began to run.

¶ 41        Recognizing the primary cause of the children first coming into care was the issue of domestic violence, the trial court remarked respondent mother was referred for domestic violence counseling and individual counseling three times and "really struggled to engage meaningfully." Although it appeared she addressed any parenting issues in a timely fashion and was found not in need of substance abuse treatment, she continued to struggle with meaningful engagement in domestic violence and individual counseling. Respondent began domestic violence counseling in December 2017 but was terminated for nonattendance before April 2018. She was referred for the third time in April 2018, this time experiencing delays and missed sessions. As a result, by the time respondent actually began making progress in April 2019, she was still attending a program that should have taken 24 weeks, and she still had six sessions to attend. Any real progress being made by respondent was not seen until sometime between January and April 2019.

¶ 42        On the issue of individual counseling, the trial court noted the testimony of the witnesses revealed respondent had irregular attendance between June and September 2018, ultimately resulting in her termination from the program in October 2018. The court considered this instructive in assessing respondent's progress as of August 20, 2018, noting she had failed to be "meaningfully engaged" in treatment during that time. In fact, respondent only started to make progress after she began to attend regularly, which was after the nine-month period. She also had irregular attendance with her individual counseling sessions and was terminated from counseling in October 2018 due to her lack of attendance.

¶ 43        Addressing one of respondent's explanations for failing to make reasonable

progress, the court noted the testimony revealed the fifth month of respondent's pregnancy, when she said she became most ill and unable to attend, was during the last month of the relevant nine-month period. She did not begin to really engage in services until after the nine-month period had already expired. "[I]t doesn't explain the lack of progress by August 20 and certainly wouldn't be a basis for me to find that some lack of efforts by [DCFS] caused her to not be able to make that reasonable progress."

¶ 44        In response to respondent's claim she had transportation issues, the trial court found, although a lack of transportation can provide a basis for a claim alleging failure by DCFS to provide respondent an opportunity to engage in services and make progress, such was not the case here. According to the testimony, respondent lived in the same area where she needed to attend her classes, and the court was doubtful of respondent's claim the previously provided bus tokens were only valid for juveniles. The court found even if that were true, it was a problem which could have easily been corrected via inquiries to DCFS staff. However, because "she kept these service providers at a distance and prioritized other things in her life, specifically employment, which she maintained consistently," she did nothing to address this issue. The trial court found the State had proved by clear and convincing evidence respondent was unfit. The matter was set for a best-interest hearing.

¶ 45                            C. Best-Interest Hearing

¶ 46        In August 2019, a best-interest hearing was held. The trial court acknowledged receipt of the best-interest report and inquired of all counsel whether there were any additions or corrections to be made. There being none, neither the State nor the GAL presented evidence. Respondent testified, describing her most recent visit with the children. She said she felt she had a mutual bond with all three children. Respondent testified she was currently engaged in

- 14 -

individual counseling at the Center for Youth and Family Solutions, learning how to cope with her past and avoid situations such as those she was in previously. She said she had completed domestic violence counseling through Cognition Works. In response to the best-interest report indicating respondent was not being honest with DCFS, she admitted she did not tell them she had been evicted. She testified her children reported they were being beaten at their foster placement.

¶ 47 In response to respondent's allegation, the State presented the testimony of Linda Campbell, the DCFS caseworker assigned to respondent's children since April 2019. She testified no one has reported, and she has seen no evidence of, the use of corporal punishment on the children, and none of the children have reported being beaten to her during her monthly visits.

¶ 48 After arguments from all of the parties, the trial court prefaced its ruling by noting: "Today's decision is one that is guided and determined by the best interests of the children," and "the law requires I do this, and look at the children and what is in the children's best interest moving forward." The court considered the statutory factors upon which its decision was to be based.

¶ 49 The trial court recognized, as was argued by respondent, the nine-month period for her to make reasonable progress ended some time ago. However, from the end of that nine-month period even until today, "she hasn't restored herself to fitness and ability, and that's something that I need to consider because the statute says I have to. She still is not in a position to provide for the physical safety and welfare of the children ***." The adjudication occurred over two years ago, and even after a two-year period, respondent was still not in a position to "safely exercise custody and care of these children." After recognizing that respondent had made

some progress at times, the court stated, "[T]oday's hearing isn't about blame[,] *** [i]t's about what's in the best interests of the children right now today, and the fact is that [respondent] has not addressed the problems that prevent her from being able to safely have custody of the children, and at that point in time when that would happen is just not on the foreseeable horizon."

¶ 50        The trial court then cited the statutory factors it must consider and addressed them with each child. Regarding J.N., who was five years old, the court said he had been with his foster family since October 2018, where he has found "stability and consistent support." The court quoted from the CASA report regarding J.N.'s current placement: "[H]is physical and mental health, school, recreation and extended family relationships are priorities here. This is a place where appointments are always made [,] *** he has developed that sense of familiarity and security in this home, and it has not been easy, and he struggles still. But in that home, he find[s] dependable and appropriate attention to and management of his struggles. He can be adopted and find permanency here."

¶ 51        Regarding C.N., who was three and a half years old, the trial court found she had resided with her foster family and her sister I.D. since she was 13 months old, it is the only home she knows, and she has become strongly bonded with her foster parents and siblings and is developing in a positive way. Permanency is available through adoption by the foster parents, with whom she has had continuity and stability.

¶ 52        The trial court noted I.D., who was two years old, had been placed with her foster parents since she was only about two days old, having been placed there by respondent even before DCFS involvement. It is the only home she knows. She is "strongly bonded with her foster family" and "is also developing in a consistent and positive way." The court found their

current placement can provide for both her and C.N.'s "physical health, school, recreation and extended family relations" as well as provide the needed consistency and stability.

¶ 53     The trial court concluded it would be more disruptive for the children to be taken out of their current foster care setting and taken somewhere else, even if that placement was with respondent. After considering all the evidence and applying the relevant statutory factors, the court found it was clear by not only a preponderance of the evidence, but by clear and convincing evidence, it was in the best interest of the children and the public to terminate respondent's parental rights.

¶ 54     This appeal followed.

¶ 55                              II. ANALYSIS

¶ 56     Respondent argues the trial court erred in determining she was unfit and terminating her parental rights because the decision was against the manifest weight of the evidence. We disagree.

¶ 57     "A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *In re Gwynne P*., 215 Ill. 2d 340, 349, 830 N.E.2d 508, 514 (2005). The proper role of a reviewing court in the matter of parental unfitness is whether the trial court's finding of unfitness was against the manifest weight of the evidence. *In re C.N.*, 196 Ill. 2d 181, 208, 752 N.E.2d 1030, 1045 (2001). "Under a manifest weight of the evidence standard, we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and the witnesses ***." *In re D.F.*, 201 Ill. 2d 476, 498-99, 777 N.E.2d 930, 943 (2002). Even so, "[c]ourts will not lightly terminate parental rights because of the fundamental importance inherent in those rights." *In re Veronica J.*, 371 Ill. App. 3d 822, 831, 867 N.E.2d 1134, 1142 (2007) (citing *In re M.H.*, 196 Ill.

2d 356, 362-63, 751 N.E.2d 1134, 1140 (2001)). In relevant part, section D of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2016)) provides:

> "D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child that the child will be placed for adoption. The grounds of unfitness are any one or more of the following, except that a person shall not be considered an unfit person for the sole reason that the person has relinquished a child in accordance with the Abandoned Newborn Infant Protection Act:
>
> * * *
>
> (m) Failure by a parent *** (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987 or dependent minor under Section 2-4 of that Act."

¶ 58 Only evidence within that nine-month period alleging the respondent failed to make reasonable progress toward the return of the child may be considered by the trial court. *In re Brianna B.*, 334 Ill. App. 3d 651, 656, 778 N.E.2d 724, 729 (2002).

¶ 59 " ' "Reasonable progress" is an objective standard which exists when the court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at

- 18 -

that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child.' " (Emphases in original.) *In re A.P.*, 277 Ill. App. 3d 592, 598, 660 N.E.2d 1006, 1011 (1996) (quoting *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991)).

¶ 60      "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004); see also *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 80, 966 N.E.2d 1107 (stating, once the trial court finds the parent unfit, "all considerations, including the parent's rights, yield to the best interests of the child"). When considering whether termination of parental rights is in a child's best interest, the trial court must consider several factors within "the context of the child's age and developmental needs." 705 ILCS 405/1-3(4.05) (West 2016). These include the following:

> "(1) the child's physical safety and welfare; (2) the development of
> the child's identity; (3) the child's familial, cultural[,] and religious
> background and ties; (4) the child's sense of attachments, including
> love, security, familiarity, continuity of affection, and the least
> disruptive placement alternative; (5) the child's wishes and long-
> term goals; (6) the child's community ties; (7) the child's need for
> permanence, including the need for stability and continuity of
> relationships with parent figures and siblings; (8) the uniqueness of
> every family and child; (9) the risks related to substitute care; and
> (10) the preferences of the person available to care for the child."
> *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1072, 859 N.E.2d 123,

141 (2006); see also 705 ILCS 405/1-3(4.05)(a) to (j) (West 2016).

¶ 61　　　　A trial court's finding that termination of parental rights is in a child's best interests will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Dal. D.*, 2017 IL App (4th) 160893, ¶ 53, 74 N.E.3d 1185. The court's decision will be found to be "against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *In re Keyon R.*, 2017 IL App (2d) 160657, ¶ 16, 73 N.E.3d 616.

¶ 62　　　　Here, the relevant nine-month period for assessing reasonable progress was between November 10, 2017, and August 20, 2018. The case was opened based upon current incidents and a past history of domestic violence in the home, including incidents in the presence of at least some of the children. Nine months after adjudication and well after respondent was to be involved in a number of services, including domestic violence counseling, she was engaged in another incident of domestic violence with a different paramour in March 2018. This was in the middle of the nine-month period during which her efforts and progress were being measured. At the time Lauren Smith took over monitoring respondent's case in April 2018, respondent was not engaged in domestic violence counseling as was required. She was referred for domestic violence services at least three times and was terminated from the program during the relevant nine-month period due to inconsistent and irregular attendance. In fact, in April 2019, approximately eight months after the nine-month period to demonstrate reasonable progress for reunification with her children ended, she still had six sessions left to complete.

¶ 63　　　　During that same nine-month time period, respondent moved into a new residence and refused to provide the name of her roommate, thereby preventing DCFS from conducting the mandatory background check. Further, she refused to allow her caseworker into

her apartment, and before DCFS could perform the required "home safety check," she moved again. Although visits had previously been supervised at her residence when she lived with her sister, respondent was aware her refusal to identify her roommate or allow admission to the apartment required DCFS to move her supervised visits from the home, and for at least several months visits had to take place at some public location or LSSI offices. Rather than provide her small children visitation in a comfortable environment with which they were familiar, she was willing to force visits elsewhere in order to avoid identifying with whom she was living and permit an inspection. This was in May or June 2018, approximately 10 or 11 months after disposition and nearing the end of the relevant nine-month period. When offered third-party supervision so an LSSI caseworker or visitation monitor did not have to be present, respondent never provided the name of a friend or relative with whom the children might have been more comfortable. Instead, she inquired about the possibility of allowing a male companion with whom she had been "talking" for several months to serve in that capacity, without being willing to identify him. With regard to the visits themselves, respondent did not bring necessary supplies for the children during her scheduled visits, although she was informed of the need to do so, and she had difficulty maintaining control and discipline of the children during these visits.

¶ 64 Respondent's explanations for failing to fully participate or complete services were based primarily on two factors—lack of transportation and illness during pregnancy. As the trial court noted, it would have seemed a small matter to point out to her caseworker the bus tokens she was being provided worked for children, but not adults. She somehow managed to remain gainfully employed at Macy's, Bath & Body Works, and Walmart—all of which could not have been within walking distance from her apartment—but she could not figure out how to obtain the appropriate bus tokens from her caseworker. More importantly, the DCFS report

submitted at the termination and fitness hearing indicated DCFS did not purchase student or children's bus tokens and, in fact, repeatedly offered her a yearly pass, which she declined.

¶ 65 With regard to her illness during pregnancy, by her own testimony, the debilitating nature of her illness began in the fifth month of her pregnancy which, as the State noted in its closing argument, would have been in August 2018, at the end of the nine months alleged in the motion.

¶ 66 The trial court applied the proper standards of proof for both the fitness hearing and best-interest hearing, referenced all relevant statutory factors upon which it was to rely, and clearly identified its findings as to each allegation and each child when addressing best interest factors. Properly focusing on the evidence and testimony within the nine-month period, the trial court noted respondent started to make meaningful progress with counseling only after her attendance became a regular occurrence, which was after the nine-month period. The record before us reveals the trial court properly considered the testimony and evidence related to respondent's efforts to make reasonable progress within the nine-month period before finding by clear and convincing evidence respondent was unfit. As noted above, under the manifest weight of the evidence standard, "we give deference to the trial court as the finder of fact because it is in the best position to observe the conduct and demeanor of the parties and the witnesses ***." *D.F.*, 201 Ill. 2d at 498-99.

¶ 67 Giving proper deference to the trial court and relying on the record before us, the trial court based its decision on the evidence and testimony within the nine-month period of August 2017 to November 2018 before making its determination respondent did not demonstrate reasonable progress and was unfit. Therefore, we cannot say the trial court's decision was "unreasonable, arbitrary, or not based on the evidence." *Keyon R.*, 2017 IL App (2d) 160657,

¶ 16. The evidence before us supports the trial court's determination that the alleged grounds for unfitness regarding respondent's failure to make reasonable progress within the outlined nine-month time period was "supported by clear and convincing evidence." *Gwynne P.*, 215 Ill. 2d at 349. Although respondent does not argue the court's decision to terminate her parental rights following the best-interest hearing was against the manifest weight of the evidence, from our review of the evidence, she would have fared no better under that standard.

¶ 68 Having considered respondent's failure to make reasonable progress and assessing her credibility regarding her stated reasons, the trial court properly directed its focus on the best interest of the children. Respondent argues the court should take into consideration the fact that the relevant period of unfitness alleged in the motion ended a year prior to the best-interest hearing, as if the failure of respondent to make adequate progress over an extended period of time should have somehow worked to her benefit.

¶ 69 The court noted, some two years after the case began, respondent "has not addressed the problems that prevent her from being able to safely have custody of the children," and it then evaluated each child's current situation according to the relevant statutory factors. Recognizing the young age of the children, the court made the following observations. Regarding J.N.'s current placement, the court stated he has been living with the same family for more than one year, where he has found "stability and consistent support" and "has developed that sense of familiarity and security in this home." In addition, he is placed with a younger sibling who is not a part of this case. The court noted J.N.'s emotional problems lessened as his contact with respondent lessened. According to the CASA report, "his physical and mental health, school, recreation and extended family relationships are priorities here," and "[h]e knows he is always safe and cared for, loved." Regarding C.N.'s current placement, the court noted she

has been in the same foster placement since she was 13 months old and is now three and a half years old. "It's the only home she would remember." She is currently placed with her sister, I.D., and two teenage children and has become "strongly bonded with her foster parents and siblings, and she is developing in a consistent and positive way." She is currently calm and content and is benefiting from the educational materials in her current placement and has continuity and stability with her foster parents. I.D., who is two years old, has been with the same foster family since being placed there by respondent before DCFS involvement, when she was about two days old. "It is the only home that she knows." She has "strongly" bonded to her foster parents, who make family relationships a priority. She too was found to be developing in a "consistent and positive way." Each of the placements has indicated their desire to adopt these children, thereby providing them with permanency. The court referenced other statutory factors, including the children's identities as well as their backgrounds and ties, including familial, cultural and religious, their sense of attachment, security and familiarity, continuity of affection and the least disruptive placement alternative, along with community ties, need for permanence, and preferences of the persons available to care for the children. The court noted it was "considering all of these factors" in making its best-interest determination, stating that the most disruptive placement would be to remove the children and return them to respondent.

¶ 70     It is clear the trial court considered the relevant statutory factors "in the context of the child's age and developmental needs" (705 ILCS 405/1-3(4.05) (West 2016)) before determining respondent's relationship with the children must "yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. The trial court then concluded, "[I]t is clear to me that by a preponderance of the evidence and clear and convincing evidence that it's in the best interests of the respondent['s] children and the public that [respondent] have all residual,

natural parental rights and responsibilities terminated."

¶ 71    The trial court's decision will be found to be "against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the decision is unreasonable, arbitrary, or not based on the evidence." *Keyon R*., 2017 IL App (2d) 160657, ¶ 16. The record before us reveals the trial court made an objectively reasonable decision based on the evidence presented. Therefore, we find the court's order finding respondent unfit and terminating her parental rights was not against the manifest weight of the evidence.

¶ 72                                    III. CONCLUSION

¶ 73    For the reasons stated, we affirm the trial court's judgment.

¶ 74    Affirmed.